# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

TAMMY COOPER, o/b/o K.C.,    )
                                      )
                Plaintiff,       )
                                      )
                                      )
    vs.                       )       No. 4:09CV00945 AGF
                                      )
                                      )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security    )
Administration,               )
                                      )
                Defendant.     )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security, denying Tammy Cooper's application for supplemental security income ("SSI") filed on behalf of her minor daughter, K.C. (hereinafter "Plaintiff"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff was born on November 18, 1992. Plaintiff's mother, Ms. Cooper, applied for SSI benefits on October 31, 2005, claiming that Plaintiff, age 12, was disabled as of the filing date, due to major depression with psychotic features. The application was denied at the initial administrative level, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on August 29, 2007, at which Plaintiff and Ms. Cooper testified. On November 15, 2007, the ALJ issued a decision

finding that Plaintiff was not disabled as defined by the Social Security Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ erred in (1) assigning less than "controlling weight" to the opinions of Plaintiff's treating physicians, (2) not examining all of the factors of 20 C.F.R. § 416.927 in considering the opinions of Plaintiff's treating physicians, (3) not pointing to specific portions of the treatment notes of LaRhonda Jones, M.D., Plaintiff's treating psychiatrist, that conflicted with the specific entries in her medical source statement ("MSS"), (4) failing to note that Mary Jo Price, L.P.C., R.P.T., a licensed counselor, is not legally obligated to provide her treatment notes, (5) not acknowledging the Dr. Jones's higher status as a psychiatrist with a medical degree as compared to the status of Alison Burner as a psychologist with a master's degree, and (6) excluding Plaintiff's psychological limitations when considering the health and physical well-being domain of functioning.

Plaintiff also argues that the ALJ violated Plaintiff's due process rights by (1) considering evidence of an attempted post-hearing contact with Dr. Jones without proffering that evidence to Plaintiff, and (2) failing to make "every reasonable attempt" to contact Dr. Jones for additional evidence needed, as required by Social Security Rule (SSR) 96-5p. Plaintiff asks this Court to remand the case to the Commissioner with

instructions to pay Plaintiff benefits, or alternatively, with instructions to reconsider Plaintiff's claim.

## BACKGROUND

### School and Medical Records

The record indicates that Plaintiff repeated the second, third, and fourth grade. (Tr. 212, 228.) On January 30, 2004, when Plaintiff was in the fourth grade, the Special School District of St. Louis County, Missouri ("SSD"), held a diagnostic evaluation conference with Ms. Cooper, Plaintiff's school psychologist, Plaintiff's resource room teacher, and Plaintiff's classroom teacher. Based on the results of the SSD multidisciplinary evaluation, the diagnostic team found that Plaintiff did not meet the Missouri Department of Elementary and Secondary Education's entry criteria for any educationally disabling condition. Plaintiff was, therefore, diagnosed as non-disabled. (Tr. 174-78.)

Plaintiff's fourth-grade report card (2004-05 school year) showed that from the first quarter to the fourth quarter, her grades went from A to B in science, A+ to B in math, C+ to A in social studies, C to B+ in writing, and B to A in reading. (Tr. 180.) With regard to her work habits and social skills, "satisfactory progress" or "needs improvement" was noted in most areas. The teacher's written comments stated that Plaintiff was making "satisfactory progress," but noted that "her social development is still a concern." (Tr. 181.) Plaintiff's teacher also noted that summer school would be required because Plaintiff was making only satisfactory progress. (Id.)

Plaintiff's first quarter, fifth-grade report card (2005-06 school year) showed that Plaintiff's reading performance remained at an A grade level. The teacher's comments noted that Plaintiff was doing well in reading, but that she had a weakness with decoding or sounding out new words. The report card also noted that Plaintiff was reading at a third-grade reading level. (Tr. 158.)

Plaintiff was referred to the Hopewell Center, a community mental health center, by her school on April 28, 2005, for psychiatric evaluation. The school stated it made the referral because Plaintiff was having trouble maintaining attention and listening when spoken to directly, was easily distracted and often forgetful on daily activities, talked excessively and blurted out consistently, had trouble waiting for her turn and often intruded on others, and frequently got involved in fights, all of which severely hurt her academic progress. Her mother reported that these problems began in the third grade. Plaintiff's school attendance was described as perfect, but her grades and behavior were "not good." Plaintiff had no chronic physical illness and was not on medication. (Tr. 230-32.)

The therapist conducting Plaintiff's intake assessment at Hopewell on April 28, 2005, noted that Plaintiff's clothes were appropriate, and she appeared neat with good personal hygiene. Her behavior was good, and she was respectful and cooperated very well. Plaintiff's stream of thought appeared normal, and she denied having hallucinations or delusions. She also denied suicidal or homicidal ideations. Her speech appeared normal, with short sentences that were easy to follow and understand. Her mood was

good, her affect broad-ranged, and her mood and affect appeared congruent. Her memory appeared intact, she appeared oriented to person, place, and thing, and her fund of knowledge appeared adequate for her age. She appeared insightful and aware of her problems, and the need to work on them. Her sense of judgment appeared good. The assessment was attention deficit-hyperactivity disorder ("ADHD"), combined type. Her Global Assessment of Functioning ("GAF")[1] was 60. (Tr. 234-36.)

On May 14, 2005, Patrick Oruwari, M.D., a psychiatrist at the Hopewell Center, performed a psychiatric evaluation of Plaintiff. Dr. Oruwari noted that Plaintiff's chief complaint was Plaintiff getting out of her seat. In describing the history of Plaintiff's present illness, Dr. Oruwari noted that Plaintiff was behind in school because of difficulty in concentrating and doing her work. Plaintiff was easily distracted and very forgetful. She talked a lot and was very hyperactive. She was not defiant, but her grades had been dropping. Plaintiff did not have tantrums, had no symptoms of depression, and had no problems with sleep, appetite, or violent behavior. Her grades were at the second grade level, while she was actually in the fourth grade. Her reading was markedly poor. She had repeated second grade and risked repeating fourth grade if she did not do better. She

---

[1]A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

would be attending summer school to help make up for her deficiencies, and only if she did it successfully could she go into the next grade. Plaintiff had no problems with stealing, no problems with cruelty to animals or playing with fire, and denied any symptoms of psychosis.

Dr. Oruwari noted that Plaintiff was a shy girl who had "her eyes closed with her hands," was very fidgety, but was cooperative. Her speech was normal, but not spontaneous. She denied hallucinations or delusions, and had normal affect and mood. She had fair insight, but with poor judgment, and her impulse control was poor. Her intelligence was average. Dr. Oruwari assessed ADHD, predominantly inattentive type, and a GAF of 50. (Tr. 228-29.)

On October 28, 2005, Plaintiff began seeing Dr. LaRhonda Jones, a psychiatrist. Plaintiff presented with behavior problems. Plaintiff, who had progressed to fifth grade, was talking in class, being disrespectful and disruptive. She had difficulty concentrating, paying attention, and staying focused. Dr. Jones diagnosed Plaintiff with a Learning Disorder Not Otherwise Specified and ADHD. She also recommended that Plaintiff's Individualized Education Program ("IEP") be reconvened so that Plaintiff could be placed in a smaller classroom setting that would allow for less distractions and more one-on-one instruction. Dr. Jones stated that treatment for Plaintiff's ADHD was only the beginning of what Plaintiff needed, and it was imperative that her needs be identified so that she could be successful in school. Dr. Jones prescribed Concerta to Plaintiff. (Tr. 207-10.)

On November 22, 2005, Plaintiff's fifth-grade teacher, Ann Hale, completed a

6

teacher's questionnaire for the state agency for disability determinations. The questionnaire asked the teacher's opinion of the student's functioning in six domains: (1) acquiring and using knowledge, (2) attending and completing tasks, (3) interacting and relating to others, (4) moving about and manipulating objects, (5) self-care, and (6) health and physical well-being.[2]

Ms. Hale opined that Plaintiff had the following levels of problems in the ten listed areas of acquiring and using information: no problem with comprehending and/or following oral instructions, or providing organized oral explanations and adequate descriptions; slight problems in understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class, expressing ideas in written form, learning new material, and recalling and applying previously learned material; and an obvious problem in applying problem-solving skills in class discussions. In the comment section, Ms. Hale noted that Plaintiff worked well independently. She also noted that Plaintiff wrote a great deal in her journal and seemed to enjoy writing. (Tr. 162.)

In the domain of attending and completing tasks, Ms. Hale opined that Plaintiff had no problem with paying attention when spoken to directly, carrying out a single-step instruction, waiting to take turns, organizing her own things or school materials,

---

[2]As will be discussed later, a child is considered disabled under the Commission's regulations if she has marked limitations in two of these domains, or extreme limitations in one of the domains.

completing class/homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time; slight problems with focusing long enough to finish assigned activities and tasks, refocusing to task when necessary, carrying out multi-step instructions, and working without distracting herself or others; and an obvious problem with changing from one activity to another without being disruptive.  (Tr. 163.)

Ms. Hale reported that Plaintiff had no problems in the domain of interacting and relating to others, but noted that in the domain of moving about and manipulating objects, Plaintiff was not functioning at an age-appropriate level.  In the domain of self-care, Ms. Hale opined that Plaintiff had no problems handling frustration appropriately, taking care of personal hygiene, caring for personal needs, and using good judgment regarding personal safety and dangerous circumstances; and slight problems with being patient when necessary, using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help.  (Tr. 164-66.)

On January 20, 2006, Dr. Jones saw Plaintiff, and affirmed the ADHD diagnosis. Dr. Jones changed Plaintiff's medication from Concerta to Adderall.  Dr. Jones noted that Plaintiff reported that her holiday was fine, but that her behavior was declining.  Dr. Jones noted that Plaintiff tended to talk fast.  Plaintiff reported that she stayed up later at night since her stepmother passed away and that her thoughts raced.  She could not get to sleep, but she did not have nightmares.  Her appetite was stable. She tended to be "hyper."  She did not report aggression or anger.  She reported that school was fair and

her grades ranged mostly from A to C.  She did not feel that her medication worked, but noted no side effects.

Plaintiff's general appearance was fair.  Psychomotor activity, speech, and behavior were within normal limits.  Her mood and affect were "okay" and "full."  Her thoughts were goal directed, with no evidence of suicidal or homicidal ideation or psychosis.  She was oriented and physically healthy.  Her GAF was 55.  (Tr. 205-06.)

On February 7, 2006, Plaintiff received detention for disrupting the class after being warned to stop.  (Tr. 159.)

On February 10, 2006, Allison Burner, M.A., a licensed psychologist, performed a psychological consultative evaluation on Plaintiff upon referral by the counselor for the Missouri Social Security Disability Determinations.  Ms. Burner noted that Plaintiff was in fifth grade, even though she was of seventh-grade age, because she had been retained in both the third and fourth grade.  Plaintiff was not receiving special education. According to Ms. Burner, SSD results showed that Plaintiff's learning concerns stemmed from Borderline Intellectual Functioning, rather than from a learning disability, and that school report cards indicated average to above average grades for Plaintiff's grade placement.  Plaintiff was healthy.  Her medications included Concerta and Trazadone. Her mother reported that Plaintiff had no behavioral concerns at home.  She got along well with others and was respectful of authority.  Plaintiff's mother also reported that Plaintiff's behavior at school was within normal limits, and Plaintiff had never been suspended and was cooperative at school.  Her psychiatric history was negative.

Plaintiff's mother reported that Plaintiff had never been evaluated by any doctor other than her pediatrician who treated her ADHD. (Tr. 212-13.)

During the evaluation with Ms. Burner, Plaintiff was able to sit quietly and attentively, and was cooperative through the interview process. Ms. Burner noted that eye contact and affect were appropriate. Psychomotor agitation was not present. Plaintiff's speech was clear and her social language functioning was within normal limits. Plaintiff was oriented to person, place, and time at chronological age level. She was able to provide specific demographic information, such as her date of birth, age, address, and phone number. There was no evidence of perceptual disturbance. Plaintiff denied visual and auditory hallucinations. Plaintiff's thought content was rational and organized. Plaintiff's immediate memory was intact, and her recent and past memory were also adequate. She could discuss TV shows, childhood memories, and recall her specific actions of yesterday. Plaintiff's calculation responses were primarily correct. She could add and subtract at an age-appropriate level, without the use of manipulatives. Plaintiff's abstract thinking was within normal limits. Her insight and judgment were within the average range. Her attention and concentration were adequate and she showed no signs of ADHD. (Tr. 213.)

Ms. Burner did not note any difficulties in Plaintiff's adaptive functioning. Plaintiff was able to care for herself and her hygiene, at an age-appropriate level. She was also able to do age-appropriate chores with minimal supervision. Her mother reported that Plaintiff had appropriate peer relationships and got along with her siblings

most of the time.  Plaintiff reported having friends at school and generally enjoyed the school experience.  She also enjoyed age-appropriate activities.  (Tr. 213-14.)

Ms. Burner noted that Plaintiff was neatly dressed, and her hygiene and grooming were average.  Plaintiff appeared to be of low average intellectual functioning based upon her mental status exam results.  Plaintiff's social judgment and reasoning, abstract thinking, mental control, and short and long term memory, were in the average range. Plaintiff's mother reported that Plaintiff's reading was well below expectancy.  Previous testing supports that reading was Plaintiff's most difficult area.  However, due to slow learning, Plaintiff did not meet criteria for a learning disability.  Plaintiff's mother reported that Plaintiff had been diagnosed with ADHD and was receiving medication which controlled all symptoms.  Based upon Plaintiff's mother's reports of Plaintiff's behavior and functioning, Ms. Burner concluded that there did not appear to be any psychological difficulty and Plaintiff should be able to function adequately within society at a level commensurate with her ability.  Plaintiff's social, emotional, educational, and adaptive functioning was within normal limits, and her GAF was 65.  (Tr. 214.)

Plaintiff's composite IQ score of 87 on a test conducted on March 1, 2006, showed that she was in the low average range.  (Tr. 72.)

On March 2, 2006, Plaintiff was admitted to the hospital for five days, with suicidal thoughts and auditory hallucinations.  (Tr. 249-507.)  During Plaintiff's psychiatric evaluation upon admission to the hospital, Mojgan Makki, M.D., noted that Plaintiff's stepmother, with whom she was very close, had recently died.  Plaintiff's

mother reported that Plaintiff had become very withdrawn and isolated.  Plaintiff had

trouble sleeping and had been getting Trazodone to help her sleep at night.  Plaintiff had

expressed suicidal thoughts and experienced auditory hallucinations.  In the emergency

room, Plaintiff was extremely agitated and required Haldol and an Ativan shot to calm

her down.  Plaintiff's mother reported that Plaintiff had a history of ADHD and began

taking Adderall in January.  Plaintiff's mother also reported that when Plaintiff was not

taking ADHD medicine, she was "extremely hyper and silly and inattentive."  Dr. Makki

noted that Plaintiff was in the fifth grade, went to regular classes and her grades were

better when she was on ADHD medicine.  (Tr. 268-69.)

During the evaluation, Dr. Makki noted that Plaintiff was polite and cooperative.

She appeared to be slightly dysphoric and restricted, but there was no evidence of gross

psychotic symptoms or of gross suicidal or homicidal ideations.  Plaintiff denied any

current suicidal ideations or plans, but did report that she had thoughts of wanting to die.

She reported hearing voices.  Her insight and judgment were fair.  Dr. Makki diagnosed

Plaintiff with depression, psychosis, a history of ADHD, and her GAF was 20 to 30.  (Id.)

While in the hospital, Plaintiff received medication management, individual and

group counseling, anger management, and behavior modification.  Plaintiff was also seen

by social services and had a physical examination.  At the time of discharge, Plaintiff

denied suicidal or homicidal ideation, and auditory or visual hallucinations.  Her mood

and behavior were improved to the extent that she was safe to be discharged.  Plaintiff

was diagnosed with depression with psychosis, and a history of ADHD, and her GAF was

50.  Plaintiff was prescribed Prozac and Geodon, and instructed to follow up with Dr. Jones and  Mary Jo Price, a licensed counselor.  (Tr. 249-507.)

A March 2006 SSD Diagnostic Report found that Plaintiff was not eligible for Special Education Services.  The Report found that Plaintiff was functioning in the lowest third of her class in reading, and the middle third in math.  Her second quarter report card indicated Reading-A (3.2 grade level), Language-B+, Mathematics-C, Science-C, Social Studies-C+.  Standardized tests revealed that Plaintiff was functioning in the low average range overall.  She had evenly developed visual processing speed and short-term auditory memory, with her skills falling in the low average to average range, and her academic performance was consistent with measured cognitive functioning.  (Tr. 130-38.)

On March 14, 2006, Dr. Jones completed a Health Provider Statement for SSD. She listed Plaintiff's current medical diagnosis as major depressive disorder with psychotic features and ADHD, combined type.  She listed Plaintiff's current medications as Risperdal, Prozac, Trazodone, and Adderall.  Dr. Jones opined that Plaintiff had an emotional disability and would benefit from frequent breaks during the day to compose herself.  Dr. Jones also opined that a lighter workload would keep her from being overwhelmed, which exacerbated her symptoms.  (Tr. 154.)

Dr. Jones also wrote a Progress Note regarding Plaintiff's care on March 14, 2006 recounting Plaintiff's recent hospitalization.  Plaintiff reported that the intensity of the voices had improved, but she still heard them in the evening.  Plaintiff's appetite had decreased because she felt too sad to eat.  Dr. Jones advised Plaintiff to talk back to the

voices. Plaintiff reported that she had returned to school since her hospitalization, and school was fair, with her grades ranging from As to Cs. (Tr. 531.)

Dr. Jones noted that Plaintiff's general appearance was fair and she was cooperative. Her psychomotor activity, speech, and behavior were within normal limits. Her mood was sad and affect congruent. Her thoughts were goal directed. She was oriented. Her concentration and attention were fair. Her memory and intellect were average. Her insight and judgment were fair. The diagnosis was "rule out" schizoaffective disorder and ADHD. (Tr. 532.)

Also on March 14, 2006, Ms. Price completed a Health Provider Statement for SSD. She listed Plaintiff's current medical diagnosis as major depressive disorder with psychotic features and ADHD, combined type. She listed Plaintiff's current medications as Risperdal, Prozac, Trazodone, and Adderall. Ms. Price opined that Plaintiff's emotional disability would benefit from breaks in her schedule. (Tr. 153.)

Plaintiff was again admitted to the hospital on March 29, 2006, with a diagnosis of major depression, and was discharged April 3, 2006. (Tr. 367-68.)

On April 10, 2006, state agency non-examining consulting psychologist R. R. Cottone, Ph.D., completed a Childhood Disability Evaluation Form, finding that Plaintiff's learning disability and ADHD impairments, or combination of impairments, was severe, but did not meet any of the Commissioner's listings for a deemed-disabling impairment. (Tr. 182-86.)

Dr. Jones saw Plaintiff again on April 21, 2006. Plaintiff reported that she had

started writing in her journal about her feelings. She reported that she was being placed in "Homebound Instruction" for the rest of the year, noting that there are too many distractions in school. Plaintiff was not hearing voices, but "songs" lingered in her head. She reported extreme sadness in regards to her stepmother. At times, she wished that she were dead, to go with her. Plaintiff reported that since getting out of the hospital, she had been doing better. Plaintiff was communicating with boys she had met in the hospital and by her aunt's home. Plaintiff was sleeping more, and if she sat down too long, she fell asleep. Her appetite had decreased. (Tr. 533.)

Dr. Jones noted that Plaintiff's general appearance was fair. Her psychomotor activity, speech, and behavior were within normal limits. Her mood was "okay," and her affect flat. Her thoughts were goal directed, she was oriented, and her concentration and attention were fair. Her memory and intellect were fair. Her insight and judgment were poor because she was hiding symptoms from her mother. The diagnosis was schizoaffective disorder and ADHD. Dr. Jones added Wellbutrin to Plaintiff's medications. (Tr. 534.)

On follow-up with Dr. Jones on June 13, 2006, Plaintiff stated that she had been talking with Ms. Price. Plaintiff reported that she had started to hear voices again telling her to run away from home. She also felt sad when she thought about her stepmother and slept too much. Plaintiff reported that she "passed" in school, but "did not get grades." She was not required to attend summer school. Plaintiff reported that she had been talking to a bunch of boys. However, Dr. Jones noted that Plaintiff's self-esteem seemed

to be very poor.  Plaintiff denied wishing to be dead.  Her appetite was stable and she

tended to play with her food.  The results of the mental status exam portion of Dr. Jones's

evaluation were essentially the same as on previous visits.  (Tr. 535-36.)

In September 2006, Plaintiff began receiving ten hours per week of Homebound

Instruction from Melba Robertson, an SSD teacher.  Plaintiff was taken out of school and

put into Homebound Instruction because her symptoms had not stabilized with

medication, were unpredictable, and were unable to be treated in school.  (Tr. 117-18.)

During her September 5, 2006 session with Dr. Jones, Plaintiff reported that her

summer was "okay."  She had gotten in a physical altercation with a 16-year-old living in

the home.  She began choking the girl for talking about her stepmother.  Her grades were

fair.  Plaintiff did pass, although she missed a lot of class.  She had been attending school

in the sixth grade.  She had an episode in class, in which she began hearing voices telling

her to kill others.  She did nothing, but the school was fearful.  There were no episodes of

aggression at school.  She continued having trouble sleeping.  According to her mother,

Plaintiff was more depressed.  The results of the mental status exam portion of Dr.

Jones's evaluation were essentially the same as on previous visits.  (Tr. 537-38.)

On November 2, 2006, Ms. Robertson stated that she could keep Plaintiff's

complete attention for one hour, after which it became harder to keep her attention.  (Tr.

80.)  In a separate undated letter, Ms. Robertson stated that Plaintiff's work was neatly

done and that Plaintiff was always respectful to Ms. Robertson.  Ms. Robertson reported

that Plaintiff wanted to do her schoolwork and responded well to positive comments and

praise. Ms. Robertson stated that Plaintiff appeared to be "a highly intelligent girl" who "has a lot of potential that could be maximized given the right circumstances." (Tr. 115.)

On November 2, 2006, Ms. Price completed an MSS on Plaintiff, in which she stated that she had treated Plaintiff on March 14, 2006. In the domain of acquiring and using information, Plaintiff had a marked level of limitation in learning new material, applying previously learned material, applying problem solving skills, reading comprehension, comprehending and following oral instructions, and responsively answering questions. She had an extreme level of limitation in expressing ideas in writing and solving math problems. In the domain of attending and completing tasks, Plaintiff had a marked level of limitation in remaining alert, carrying though and finishing activities, carrying out instructions, avoiding being fidgety, overactive, or restless, and in controlling impulses. She had an extreme level of limitation in focusing and maintaining attention, working without needing task redirection, and maintaining pace. (Tr. 510- 12.)

In the domain of interacting and relating with others, Plaintiff had a marked level of limitation in getting along with other children, in following rules, and in avoiding fighting with peers. She had an extreme level of limitation in initiating a conversation, and taking turns in and maintaining a conversation. In the domain of moving about and manipulating objects, Plaintiff had a marked level of limitation in the use of fine motor skills. In the domain of caring for herself, Plaintiff had a marked level of limitation in regard for safety rules and sleep. She had an extreme level of limitation in avoiding harmful behavior towards herself, bathing and personal hygiene, using language

17

sufficiently to express basic wants and needs, coping with stress, and coping with change. Ms. Price stated that the earliest date from which the limitations existed at this severity was prior to her March 14, 2006 admit date.  (Tr. 511-12.)

On November 2, 2006, Dr. Jones completed an MSS on Plaintiff.  In the domain of acquiring and using information, Plaintiff had a marked level of limitation in learning new material, applying previously learned material, applying problem solving skills, reading comprehension, comprehending and following oral instructions, responsively answering questions, expressing ideas in writing, and solving math problems.  In the domain of attending and completing tasks, Plaintiff had a marked level of limitation in remaining alert and maintaining pace.  She had an extreme level of limitation with focusing and maintaining attention, carrying through and finishing activities, working without needing task redirection, carrying out instructions, avoiding being fidgety, overactive or restless, and controlling impulses.  (Tr. 515-17.)

In the domain of interacting and relating with others, Plaintiff had a marked level of limitation in avoiding fighting with peers, initiating conversation, tolerating differences, and considering others' feelings and points of view.  She had an extreme level of limitation in getting along with other children, following rules, having the ability not to be disruptive or talk out of turn, obeying authority, and avoiding temper outbursts. She had no level of limitations in the domain of moving about and manipulating objects. In the domain of caring for herself, Plaintiff had a marked level of limitation in bathing and personal hygiene and sleep.  She had an extreme level of limitation in avoiding

harmful behavior towards herself, next to which Dr. Jones handwrote "cutting and rubbing burns on arms," as well as having regard for safety rules, coping with stress, and coping with change. Dr. Jones had been treating Plaintiff since October 28, 2005. Dr. Jones opined that the earliest date from which the limitations assessed had existed at the assessed severity was "prior," with no specific date noted. (Tr. 516-17.)

On November 16, 2006, Plaintiff's fifth-grade teacher, Ms. Hale, wrote a letter stating that Plaintiff was below grade level in all areas, but particularly reading. With modifications, Ms. Hale stated that Plaintiff was able to perform adequately in other academic areas. Ms. Hale noted that Plaintiff loved to write at her level and would spend a great deal of time writing, occasionally bringing in something she had written over the weekend to share with Ms. Hale. These writings were often about her family. Plaintiff shared pictures of her family with Ms. Hale, particularly pictures of her mother's wedding. Ms. Hale stated that there were times when Plaintiff would challenge authority and become confrontational, but in general she wanted to please. Plaintiff was older than the rest of the class, and Ms. Hale opined that Plaintiff felt a bit self-conscious and that being the eldest in the class affected her behavior. Plaintiff was either complacent or challenging and Ms. Hale could not identify the cause of her mood changing. In the spring, Plaintiff was absent for a long period. When she returned, Plaintiff told Ms. Hale she was hearing voices, which always involved some type of harm. Plaintiff could be very docile, or at times she could be very irritated by anything. Plaintiff recognized those times and Ms. Hale would send her to the nurse because she was concerned for Plaintiff's

safety, and the safety of Plaintiff's classmates. (Tr. 116.)

Ms. Hale also completed a questionnaire on November 16, 2006 in which she noted that Plaintiff daydreamed and stared away from task hourly. On a daily basis, Plaintiff needed directions or lessons repeated, worked slowly and did not complete class assignments, drew or doodled at inappropriate times, had difficulty making a transition from one activity to another, destroyed or threw away work, denied inappropriate behaviors, and acted impulsively. Plaintiff did not smile, laugh or demonstrate happiness, was pessimistic, and was apathetic and unmotivated. (Tr. 83-84.)

On November 20, 2006, Plaintiff's sixth-grade teacher, Ms. CaSandra Johnson, wrote a letter stating that Plaintiff was below grade level in all areas including reading. Ms. Johnson also described an incident in August of 2006, in which Plaintiff informed Ms. Johnson that she was hearing the voices of dead people who were telling Plaintiff to kill people. Several weeks later, the school counselor informed Ms. Johnson that Plaintiff would be home-schooled and Ms. Johnson began sending work home. (Tr. 114.)

In another November questionnaire, Ms. Johnson noted that on a daily basis Plaintiff daydreamed and stared away from task, and socialized at inappropriate times. She also noted that on a weekly basis, Plaintiff did not complete her homework. (Tr. 82.)

On November 29, 2006, Plaintiff's school counselor and reading facilitators referred Plaintiff for a special education evaluation due to health/motor, social/emotional/behavioral, and academic/pre-academic concerns. Plaintiff was below expected achievement in both reading and math. Plaintiff's mother was concerned about

Plaintiff taking care of her personal needs without reminders, complying with family rules, admitting when she had done something wrong, responding to discipline, becoming easily frustrated or angry, and managing money appropriately. (Tr. 64-68.)

Dr. Jones saw Plaintiff again on December 12, 2006, at which point she noted that she believed Plaintiff could go back to school all day. Dr. Jones noted that Plaintiff had not had any "moodiness" since she had been going to school a half a day and she was missing her core classes. Plaintiff reported that she liked going to the "kindergarten teacher room," which helped her calm down. She had not received any grades. Her sleep and appetite were stable. She was not taking her medication as she should, but she had not been experiencing depression. She denied wanting to harm herself or being bothered by voices. The results of the mental status exam portion of Dr. Jones's evaluation were essentially the same as on previous visits, but her concentration, attention, memory, intellect, insight, and judgment had improved. Dr. Jones noted that she would write a letter to return Plaintiff to school and Plaintiff was to continue her current medications. (Tr. 539-40.)

That same day, Dr. Jones wrote a letter opining that Plaintiff was ready to return to school for a full day, so long as she was allowed to go to the kindergarten room for "breaks." She further opined that Plaintiff would benefit from a smaller classroom and self contained setting. (Tr. 121.)

A February 11, 2007 progress report stated that Plaintiff had moderate schizoaffective disorder with command type auditory hallucinations, ADHD, and below

grade level functioning in reading, math, and spelling.  Plaintiff's response to medical treatment was fair and included psychiatric hospitalization and five types of medications. She received ten weeks of one-to-one homebound instruction due to her medical condition.  She attended school for half days with frequent scheduled breaks.  Plaintiff was easily distracted due to her ADHD and had racing thoughts.  She was easily frustrated and lashed out impulsively.  According to current test results, Plaintiff had made little to no gains in reading and math, despite homebound instruction.  Her academic progress had not increased.  Plaintiff's below grade level functioning may be commensurate with her measured intellectual ability.  Two previous SSD special education evaluations in January 2004 and March 2006 did not qualify Plaintiff for SSD services because her academic achievement approximated her cognition.  On February 1, 2007, Plaintiff's intervention plan ended.  Plaintiff was attending classes, had good attendance, and had not heard any voices.  Despite her psychiatric disorder, Plaintiff functioned adequately at school.  (Tr. 109.)

Plaintiff's third-quarter sixth-grade report card (2006-07 school year) showed  that Plaintiff received a B in reading, C in writing, A in science, C in math, and an A in social studies.  Plaintiff's work habits and social skills were all noted to be satisfactory.  The teacher's written comments stated that Plaintiff "has great potential," but noted that "her lack of understanding hinders her ability to learn."  (Tr. 91-94.)

A March 26, 2007 Student Progress Report stated that Plaintiff had taken the Scholastic Reading Inventory test in August 2006, November 2006, December 2006, and

March 2007.  Her basic performance remained below grade level on each of these tests.  (Tr. 101.)

On an April 13, 2007 questionnaire, Plaintiff's Counselor, Janice Smith, commented that Plaintiff forgot things "once in a while" and was "occasionally off task." Ms. Smith also checked the boxes indicating that Plaintiff blamed others for mistakes and acted impulsively on a monthly basis.  (Tr. 85-87.)

Plaintiff returned to Dr. Jones on April 13, 2007.  Plaintiff stated that she was feeling fine; however, upon further questioning she stated that there were times when she felt really down and sad.  She missed her stepmother and continued to struggle with her death.  She liked to go to school and had no trouble.  She had been getting good grades and was doing well in school.  She was eating well and had gained a few pounds.  She wanted to get out and be active during the summer.  She claimed to be a bit sleepy and was sometimes not compliant with her medications because they made her sleepy.  The results of the mental status exam portion of Dr. Jones's evaluation were essentially the same as on previous visits, and her GAF was 75.  (Tr. 541-42.)

On April 16, 2007, Dr. Jones opined that Plaintiff had made "marked progress" and was "stable on her meds at this time."  Dr. Jones reported that Plaintiff had no difficulties with concentration, persistence, or pace, nor did she have any difficulties with cognitive/communicative, social, or personal functioning.  Plaintiff's symptoms were remitted and she was stable, but Dr. Jones opined that relapse was possible.  If she relapsed, Dr. Jones noted that Plaintiff could have hallucinations and "her symptoms

could be disruptive." (Tr. 108.)

On April 19, 2007, an IEP team determined that no additional data was needed and that a special education evaluation was not warranted. (Tr. 64.) On April 20, 2007, a special education evaluation was considered, but rejected because documentation did not support the suspicion of an educational disability. (Tr. 62.)

Plaintiff saw Dr. Jones again on July 17, 2007. Plaintiff reported that she slept a lot during the day and was going to sleep later at night. She reported that her mood had been stable, although she missed a lot of doses of medicine. She denied that she was having any hallucinations, and denied any sadness or crying spells. Her appetite was good. Her mother stated that the medicine worked well and Plaintiff needed all the medicines she was on. The results of the mental status exam portion of Dr. Jones's evaluation were essentially the same as on previous visits. (Tr. 543-44.)

### Evidentiary Hearing of August 28, 2007 (Tr. 551-66)

Plaintiff appeared in person at the hearing, accompanied by her mother, Ms. Cooper. Plaintiff was represented at the hearing by her attorney. Upon questioning by the ALJ, Plaintiff testified that she was in seventh grade, participated in regular classes at school, and had been held back in school before. She also testified that she got along with her friends at school and her brothers and sisters at home.

Plaintiff's attorney then questioned Plaintiff's mother. Ms. Cooper testified that Plaintiff was 14 years old. Plaintiff was no longer receiving special services from her school because her school had felt that Plaintiff was doing better since she had been on

medicine.  Ms. Cooper proceeded to testify that Dr. Jones had been treating Plaintiff for approximately two years, and had previously recommended a smaller class size, special school district, or a learning disability class for Plaintiff.  Dr. Jones had prescribed medication to Plaintiff, which Ms. Cooper testified she made sure Plaintiff received everyday.  The previous year, Plaintiff also saw Ms. Price approximately seven times.

Ms. Cooper testified that Plaintiff did not participate in any social activities because Plaintiff had to be supervised, or she might hear voices or be "easily misled" by others.  Ms. Cooper testified that Plaintiff was not violent, acted younger than her age, and had to be redirected several times in order to get her to follow instructions without getting sidetracked.  Plaintiff did not like crowds of people and would not go places where there are lots of people, such as the store.  She also could not be allowed to venture off on her own in a store.

Ms. Cooper testified that with her medications, Plaintiff slept more than she used to and did not hear voices as much as in the past.  A year earlier, Plaintiff had been hospitalized for a week for hearing voices and wanting to kill herself, but nothing like that had happened since Plaintiff began taking her medication.  Ms. Cooper testified that Plaintiff's concentration and focus were "basically the same," but the medication "slows her down a little bit more" such that she thought slower and had to be redirected.  Plaintiff read at a second or third grade level and could not read a newspaper or magazine.  Ms. Cooper had never observed Plaintiff doing any mathematics, nor did Plaintiff receive an allowance.  Ms. Cooper testified that Plaintiff slept most of the day

and did not make her own meals beyond a sandwich or a bowl of cereal. If she tried to cook, she forgot about the food and burned it. Plaintiff only bathed when she was told to do so.

Ms. Cooper testified that Plaintiff had been back to see Dr. Jones in the current year and visited Dr. Jones every three months. Ms. Cooper also testified that Plaintiff's hospitalization the previous year had followed Plaintiff's stepmother's death.

At the conclusion of the hearing, Plaintiff's attorney informed the ALJ that he had tried to get an update of Dr. Jones's treatment notes, to no avail. The ALJ stated that he would send Dr. Jones a letter and encouraged Plaintiff's attorney to do the same. The record indicates that the ALJ attempted to contact Dr. Jones on August 28, 2007, but received no response. (Tr. 25.)

### ALJ's Decision of November 15, 2007 (Tr. 8-31)

The ALJ found that the Plaintiff had the following severe impairments: ADHD, borderline intellectual functioning, and schizoaffective disorder. However, after considering the Plaintiff's school and medical records, the ALJ determined that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed deemed-disabling impairments.

The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that functionally equaled the listings. The ALJ found that the statements concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms were not entirely credible. There was no evidence in the school records of a

26

learning disability.  Plaintiff was diagnosed with ADHD, but that condition was controlled with medication.

The ALJ also found that Dr. Jones's treatment notes did not support her opinions of Plaintiff's functioning, as reported in the MSS dated November 2, 2006.  Dr. Jones's MSS was further contradicted by Plaintiff's school records.  The ALJ also noted that he attempted to contact Dr. Jones on August 28, 2007, but there was no response.  Finally, the ALJ found that the MSS of Ms. Price had "no basis" in the file because none of her treatment notes were submitted into evidence.

In considering the six domains of functioning, the ALJ found that Plaintiff had a marked limitation in the ability to care for herself; a less than marked limitation in acquiring and using information, in attending and completing tasks, and in interacting and relating with others; and no limitation in moving about and manipulating objects, or in health and physical well-being.  Therefore, the ALJ found that Plaintiff did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning.

Accordingly, the ALJ held that Plaintiff had not been disabled, as defined in the Social Security Act, since October 31, 2005, the date the application was filed.

## DISCUSSION

### Standard of Review

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the

substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th

Cir. 1989)). The court's review "'is more than an examination of the record for the

existence of substantial evidence in support of the Commissioner's decision'"; the court

must "'also take into account whatever in the record fairly detracts from that decision.'"

Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not

warranted, however, "merely because substantial evidence would have supported an

opposite decision." Id. (citation omitted); see also Wiese v. Astrue, 552 F.3d 728, 730

(8th Cir. 2009).

**The Determination of Disability**

Social security disability benefits are designed for disabled workers, but low-

income parents may obtain SSI benefits on behalf of their disabled children as well. 42

U.S.C. § 1382c(a)(3)(C)(I). In order to be entitled to such benefits, a child under the age

of 18 must show that he or she has a medically determinable physical or mental

impairment resulting in "marked and severe functional limitations," which can be

expected to result in death or which have lasted or can be expected to last for a

continuous period of not less than 12 months. Id.

The Commissioner's regulations set out a three-step sequential evaluation process

to determine whether a child's impairment (or combination of impairments) results in

marked and severe functional limitations. The Commissioner begins by deciding whether

the child is engaged in substantial gainful activity. If so, benefits are denied. 20 C.F.R. §
416.924(a)-(b). If not, at step two, the child's impairment is evaluated to determine
whether it is severe. The impairment is not severe if it is only a slight abnormality or
combination of slight abnormalities that causes no more than minimal functional
limitations. 20 C.F.R. § 416.924(c). If the child's impairment is not severe, there is no
disability. If the impairment is severe, at step three the ALJ compares the impairment to
the childhood listings in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix I). If the
child's impairment meets, medically equals, or functionally equals a listed impairment,
the child is disabled. 20 C.F.R. § 416.924(d).

If a child's impairment or combination of impairments does not meet or medically
equal a listed impairment, the Commission is to assess all the functional limitations
caused by the child's impairment or combination of impairments. 20 C.F.R.
§ 416.926a(a). If the functional limitations caused by the child's impairment are the same
as the disabling functional limitations cause by the listed impairments, the Commission is
to find that the child's impairment or combination of impairments is functionally
equivalent in severity to a listed impairment. In determining functional equivalence, the
Commission considers the child's functioning in six domains: (1) acquiring and using
information, (2) attending and completing tasks, (3) interacting and relating with others,
(4) moving about and manipulating objects, (5) caring for oneself, and (6) health and
physical well-being. 20 C.F.R. § 416.926a(b)(1). In order to functionally equal a listed
impairment, the child must have a "marked" limitation in two domains or an "extreme"

limitation in one domain.  Id.; Hudson ex. rel Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003); Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 80-85 (2d Cir. 2003).  A marked limitation is one that "interferes seriously" with the child's ability to independently initiate, sustain, or complete domain-related activities;  an extreme limitation is one that "interferes very seriously" with these abilities.  20 C.F.R. § 416.926a(e)(2), (3).  Not every activity in a domain must be markedly or extremely limited in order for the child's functioning in the domain as a whole to be considered so. Id.

### The ALJ Did Not Err in Discounting Dr. Jones's MSS Opinion

Plaintiff asserts that the ALJ erred in discounting Dr. Jones's November 2, 2006 MSS.  The Court finds no error in this regard, however, given the inconsistencies between the MSS and her treatment notes, as well as the Plaintiff's school records.  As discussed above, Dr. Jones was Plaintiff's treating psychiatrist.  20 C.F.R. § 416.927(d)(1)-(6) provides that if a treating physician's opinion is not granted controlling weight, the following factors will be considered when deciding what weight should be accorded to any medical opinions: the examining relationship, the treatment relationship, the supportability, the consistency, the specialization, and other factors brought to the SSA's attention.  An ALJ may, however, "discount or even disregard the opinion of a treating physician where . . . a treating physician renders inconsistent opinions that undermine the credibility of such opinions."   Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting  Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

The ALJ's assertion that Dr. Jones's opinion was inconsistent with her treatment notes and Plaintiff's school records is supported by the record. The ALJ noted a number of these inconsistencies. For example, the ALJ noted in his decision that while Dr. Jones's MSS found an extreme limitation in the ability to focus and maintain attention, carry through and finish activities, work without needing task redirection, carry out instructions, avoid being fidgety, overactive, or restless, and control impulses, Dr. Jones's treatment notes from March and April 2006 note that Plaintiff's concentration and attention were fair. In 2007, Dr. Jones found Plaintiff's psychomotor activity was fair to normal. Moreover, Dr. Jones's treatment notes indicated that, as long as Plaintiff remained on medication, her concentration, persistence, and pace remained fair to normal with no significant outbursts or problems, which was consistent with school records. Dr. Jones's MSS opinion that Plaintiff had extreme limitations in getting along with other children was also inconsistent with Dr. Jones's treatment notes, which indicated that Plaintiff had no problems with social functioning. (Tr. 26-28.)

Although the ALJ's decision was deficient in that it did not specifically address each of the factors of § 416.927(d)(1)-(6), "a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987) and rejecting the argument that the conclusory form of an ALJ's decision justifies remand).

Plaintiff's last argument, that Dr. Jones's opinion was entitled to more weight than

Ms. Burner's opinion, is unfounded. Plaintiff asserts that the ALJ "failed to acknowledge the difference between Dr. Jones's status as a psychiatrist with a medical degree and the status of Ms. Burner, the consultative examiner, as a psychologist with a master's degree." The ALJ specifically identifies "LaRhonda Jones, M.D." and "Allison Burner, a licensed psychologist," thus acknowledging the difference between their respective statuses. (Tr. 14, 18.) With regard to the weight accorded to their respective opinions, as discussed above, the ALJ was entitled to discount Dr. Jones's opinion and therefore give less weight to her opinion than that of Ms. Burner.

## The ALJ Did Not Err in Discounting Ms. Price's MSS Opinion

Given the lack of support for Ms. Price's November 2, 2006 MSS opinion, the ALJ did not err in discounting it. As discussed above, Ms. Price was Plaintiff's counselor. Under 20 C.F.R. § 404.1513(a), a counselor is not an "acceptable medical source," but is an "other" medical source of information which the ALJ must consider. See Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ has discretion in discounting "other medical evidence." 20 C.F.R. § 416.927(d)(4). See also Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) ("In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.")

The ALJ asserted that Ms. Price's MSS had no basis in the file, as none of her treatment notes were submitted into evidence, and specific inconsistencies existed between Ms. Price's opinion and the remainder of the record. This conclusion is

supported by the record.  As noted by the ALJ, Ms. Price noted that Plaintiff possessed an extreme limitation in the ability to focus and maintain attention, carry through and finish activities, work without needing task redirection, carry out instructions, avoid being fidgety, overactive, or restless, and control impulses; however, Dr. Jones's treatment notes indicated that as long as Plaintiff remained on medication, her concentration, persistence, and pace remained fair to normal with no significant outbursts or problems, which was consistent with school records.   Ms. Price also noted that Plaintiff had a marked limitation in the use of fine motor skills, but Plaintiff's teachers reported no problem with this domain, her school assessments found no problems with this domain, her mother reported no difficulty in this area, and a psychological consultative examination noted that Plaintiff could perform age-appropriate chores with minimal supervision.  (Tr. 27-29.)

Plaintiff further argues that "the ALJ's rejection of Ms. Price's conclusions provided in her MSS fails to note that Ms. Price is not legally obligated to provide her treatment notes, which were created entirely in the course of privileged therapy sessions." (Doc. No. 14 at 12.)  Plaintiff therefore argues that "Plaintiff cannot be faulted for failing to produce records that she is not legally able to obtain."  (Doc. No. 22 at 5.)  While Ms. Price may not be under an obligation to disclose her treatment notes, Plaintiff is under an obligation to prove her disability.  See 42 U.S.C. § 423(a) and 1382c(a)(3)(A); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  Plaintiff has the burden of providing medical evidence showing that she is disabled.  20 C.F.R. § 416.912.  Plaintiff provided

no support for her claim that she is "not legally able to obtain" Ms. Price's treatment notes, but merely stated that Ms. Price is "not legally obligated to provide" her notes. The ALJ was therefore entitled to discount Ms. Price's MSS opinions because they lacked support and were inconsistent in many respects with the remainder of the record.

**The ALJ Did Not Err in Excluding Plaintiff's Suicidal Ideation from the Health and Physical Well-Being Domain of Functioning**

Plaintiff argues that the ALJ erred by finding that she had only marked limitations in the domain of caring for herself and less than marked limitations in the domain of health and physical well-being, relying primarily on her suicidal ideation. (Doc. No. 14 at 12-13.) Plaintiff's argument is without merit, however, because brief suicidal ideation is not a factor of the health and physical well-being domain.

The considerations in the domain of caring for herself include: 1) continues to place non-nutritive or inedible objects in her mouth; 2) often uses self-soothing activities that are developmentally regressive; 3) does not dress or bathe age-appropriately; 4) engages in self-injurious behavior (e.g., *suicidal thoughts or actions*, self-inflicted injury, or refusal to take medication) or ignores safety rules; 5) does not spontaneously pursue enjoyable activities or interests; or 6) has disturbances in eating or sleeping patterns. See 20 C.F.R. § 416.926a(k)(3)(i)-(iv) (emphasis added). However, the domain of health and physical well-being requires the consideration of different factors including: 1) generalized symptoms, such as weakness, dizziness, agitation, lethargy, or psychomotor retardation because of any impairment; 2) somatic complaints related to an impairment;

3) limitations in physical functioning because of treatment; 4) exacerbations from an impairment that interfere with physical functioning; or 5) medical fragility requiring intensive medical care to maintain level of health and physical well-being.  See 20 C.F.R. § 416.926a(l)(4)(i)-(iv).

As the ALJ specifically noted, Plaintiff's suicidal ideation was a one-time occurrence and Plaintiff's hospitalization for suicidal ideation was brief.  (Tr. 30.) Moreover, while the sections of the record to which Plaintiff cites demonstrate "auditory hallucinations and other symptoms which resulted in her inability to attend school for an extended period of time," they also state that these symptoms were able to be stabilized with medication.  (Tr. 117-18, 268.)  As such, substantial evidence supports the ALJ's finding that Plaintiff does not have a marked limitation in health and physical well-being.

**The ALJ Did Not Violate Plaintiff's Due Process Rights**

"Procedural due process under the Fifth Amendment requires that disability claimants be provided a 'full and fair hearing.'"  Passmore v. Astrue, 533 F.3d 658, 663 (8th Cir. 2008) (quoting Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2008)).

> [T]o determine whether the process afforded is sufficient under the due process clause, courts must balance [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 664 (internal quotations omitted).  Although "[s]ocial security disability hearings

are non-adversarial proceedings and therefore do not require full courtroom procedures,"

Hepp, 511 F.3d at 804, due process requires that a claimant be "given a meaningful

opportunity to present [his] case." Mathews v. Eldridge, 424 U.S. 319, 349 (1976).

Citing HALLEX I-2-7-30,[3] Plaintiff argues that she was denied such an

opportunity because the ALJ improperly failed to proffer evidence of the ALJ's post-

hearing contact with Dr. Jones. HALLEX I-2-7-30 states that the ALJ must proffer all

post-hearing evidence unless certain criteria are met which are not applicable here. As

noted above, the record indicates that on August 28, 2007, the ALJ attempted to contact

Dr. Jones. (Tr. 25.) However, Dr. Jones did not respond to the ALJ's contact and no

new evidence was produced based upon this contact. Since HALLEX I-2-7-30 applies

only to new evidence, and no new evidence was produced, the ALJ did not err in failing

to proffer the letter at issue. HALLEX I-2-7-30, 1993 WL 643048 (S.S.A.); Mason v.

Astrue, No. CV209-085, 2010 WL 2636089, *5 (S.D. Ga. June 3, 2010) (finding that

because a post-hearing letter from the ALJ to a physician was not answered, and no new

_____

[3]HALLEX is the Hearings, Appeals and Litigation Law manual. It is published by Defendant's Associate Commissioner of Hearings and Appeals.

> [HALLEX] conveys guiding principles, procedural guidance and
> information to the Office of Hearings and Appeals (OHA) staff. HALLEX
> includes policy statements resulting from an Appeals Council en banc
> meeting under the authority of the Appeals Council Chair. It also defines
> procedures for carrying out policy and provides guidance for processing
> and adjudicating claims at the Hearing, Appeals Council and Civil Actions
> levels.

evidence was produced, the ALJ did not err in failing to proffer the letter at issue).

Plaintiff further contends that the ALJ erred in relying on Dr. Jones's failure to respond as justification for discounting Dr. Jones's opinion. The ALJ was required "to give reasons for giving weight to or rejecting the statements of a treating physician." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008). The lack of response by Dr. Jones to the ALJ's post-hearing contact was but one of three factors the ALJ considered when deciding what weight to give Dr. Jones's assessment of Plaintiff. (Tr. 25.) The ALJ also noted that Dr. Jones's treatment notes did not support her opinions of the Plaintiff's functioning as set forth in the November 2, 2006 MSS, and that Plaintiff's school records contradicted Dr. Jones's MSS. Id.

Moreover, Plaintiff had an opportunity to raise this objection and failed to do so. She requested review of the ALJ's decision by the Appeals Council within the allowed 60-day period. At that time, she could have also submitted a reply by Dr. Jones or a statement that the ALJ's contact was never received. See Hurd v. Astrue, No. 4:07CV1484 TCM, 2008 WL 4279586, *11 (E.D.Mo. Sept. 15, 2008) (finding that when the ALJ considered a physician's lack of response to the ALJ's post-hearing letter to the physician in determining what weight to give the physician's opinion, Plaintiff could have availed himself of procedural safeguards including submitting the physician's reply or a statement that the ALJ's contact was never received). She did not do so here. See Hepp, 511 F.3d at 805 ("[D]ue process is not violated in social security disability hearings when

the claimant fails to exercise the procedural safeguards that would have addressed his concerns.").

Nor does the ALJ's reference to a lack of response by Dr. Jones shock the conscience. As discussed above, the ALJ gave other reasons supported by the record for not giving Dr. Jones's opinion persuasive weight.

Finally, Plaintiff cites SSR 96-5p, 1996 WL 374183 *6, to support her argument that the ALJ failed to make "every reasonable attempt" to contact Dr. Jones for additional evidence needed.[4] However, the duty to re-contact a treating physician for clarification of an opinion only arises if a crucial issue is undeveloped. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ undertook to send Dr. Jones a letter only after Plaintiff's attorney advised the ALJ that he had tried three times to get an update of Dr. Jones's treatment notes, without success. In response, the ALJ stated he would send Dr. Jones a letter, and suggested that Plaintiff's attorney continue to try as well. The ALJ left the record open for 30 additional days in order to allow Plaintiff's attorney time to get these new records to the ALJ. (Tr. 565.) Plaintiff's attorney was able to obtain the updated records and submit them to the ALJ prior to the record being closed. (Tr. 528). The ALJ properly considered these additional records and found them inconsistent with

---

[4]SSR 96-5p provides that "Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."

Dr. Jones's MSS. (Tr. 20-22, 25-30.) Therefore, there was no undeveloped critical issue and the ALJ did not have a duty to make "every reasonable effort" to recontact Dr. Jones.

Moreover, "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable." Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006); Goff, 421 F.3d at 791 ("Here, the ALJ did not find the doctors' records inadequate, unclear, or incomplete, nor did [he] find the doctors used unacceptable clinical and laboratory techniques. Instead, the ALJ discounted the opinions because they were inconsistent with other substantial evidence. In such cases, an ALJ may discount an opinion without seeking clarification.").

For the foregoing reasons, the ALJ did not violate Plaintiff's due process rights when citing Dr. Jones's lack of response to his contact. Cf. Goad v. Barnhart, 398 F.3d 1021, 1025 (8th Cir. 2005) (reversing Commissioner's adverse decision and remanding case in which Commissioner had improper *ex parte* communication with court on why claimant had withdrawn remanded claim, such communication having been relied on by court for denial of attorney's fees to claimant's lawyer); Patrick ex rel. D.L.H. v. Barnhart, No. 4:05CV1975 ERW(LMB), 2007 WL 5110322, *14 (E.D.Mo. 2007) (finding that the ALJ violated claimant's due process rights, when evaluating claimant's credibility, by relying, in part, on evidence of building guard about claimant's behavior when waiting for hearing to begin; ALJ had failed to give claimant an opportunity to cross-examine guard, whose testimony claimant alleged was false).

## CONCLUSION

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the Court believes that the ALJ's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this case is **AFFIRMED.**


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE


Dated this 24th day of August, 2010.